**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**MORIAH JONES,**

      **Plaintiff,**

**v.**                                                                  **Case No. 3:20-CV-5-NJR**

**T.J. MAXX OF IL, LLC,**

      **Defendant.**

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on the Motion for Summary Judgment filed by Defendant T.J. Maxx of IL, LLC ("T.J. Maxx") (Doc. 35). Plaintiff Moriah Jones filed a response in opposition (Doc. 39), and T.J. Maxx filed a timely reply (Doc. 41). For the reasons set forth below, the motion is granted.

## BACKGROUND

As an "off-price apparel and home fashions retailer," T.J. Maxx depends on its employees to be at their stores on-time for scheduled shifts. *See* TJX, *A Global Off-Price Retailer*, https://www.tjx.com/company/ (last visited May 16, 2021). T.J. Maxx established attendance and disciplinary policies to hold employees accountable and to encourage dependability. T.J. Maxx's disciplinary policy is progressive—meaning that the level of discipline increases if the offense is repeated (Doc. 40, p. 12).

T.J. Maxx's discipline starts with counseling and continues to several written warnings before termination (*Id.*). Disciplinary actions for violations in T.J. Maxx's

attendance policy become inactive after twelve months from the date of issuance. (Doc. 40, p. 13). For tardies, T.J. Maxx employees first receive a formal counseling if they are tardy six times within a twelve-month period (Doc. 39-1, p. 12). If an employee is tardy two more times within the same twelve-month period—for a total of eight tardies—he or she receives a written warning (*Id.*). If an employee is tardy another two times—for a total of ten tardies—he or she receives a second written warning (*Id.*). If an employee is tardy another two times—for a total of twelve tardies—he or she is terminated (*Id.*). For no-call/no-shows, T.J. Maxx employees first receive a formal counseling (Doc. 39-1, p. 24). On an employee's second no-call/no-show within the same twelve-month period, an employee receives a written warning (*Id.*). On an employee's third no-call/no-show within the same twelve-month period, an employee receives a second written warning (*Id.*). After an employee's fourth no-call/no-show within the same twelve-month period, he or she is terminated (*Id.*).

### *Climbing the Corporate Ladder Despite a Glass Ceiling and Attendance Issues*

Jones was allegedly blocked from moving up the corporate ladder at T.J. Maxx because of a glass ceiling[1] (Doc. 39, p. 4). Jones's tenure with T.J. Maxx began in 2011, when Shirley Dugger ("Dugger")—the manager at T.J. Maxx's Carbondale, Illinois, store—interviewed and hired Jones as a part-time merchandise associate (Doc. 40, p. 10).

After a no-call/no-show in December 2012 and being tardy in January 2013—

---

[1] The phrase "glass ceiling" is used to refer to the inability to advance within a company for a variety of reasons—like race or sex. According to Jones, "[o]ne knows [the glass ceiling] has been 'reached' when lesser qualified individuals keep getting promoted while they do not, and these actions in failing to promote are discriminatory" (*Id.*).

Dugger and Tom Schultz ("Schultz"), the regional manager, promoted Jones to a part-time Customer Experience Coordinator position in February 2013 (*Id*.; Docs. 36-5, 36-6, 36-8). At Jones's first annual performance review, Jones's managers noted that she "had some tardy instances in the past but has actively worked to improve upon this area" (Doc. 39-12, p. 3).

Jones continued to have attendance issues even after her managers pointed out her tardies in the dependability section of her first annual review. In August 2013, Jones was formally counseled for tardies (Doc. 36-8). In October 2013, she had a second no-call/no-show (*Id*.).[2] In January 2014, Jones was formally counseled again for tardies (*Id*.). At Jones's second annual performance review, Jones's managers again noted that she "has some issues with tardiness and attendance in the past year[,] but she worked to resolve these concerns and improve upon her dependability showing she is committed to her role and improving" (Doc. 39-12, p. 7).

Jones continued to have attendance issues even after her managers pointed out her tardies in the dependability section of her second annual review. In fact, in February 2016, Jones was formally counseled for being tardy seven times in the prior twelve months (Doc. 36-15). At Jones's fourth annual performance review, her managers again noted that Jones "had tardy issues and is working with management to improve, management will continue to monitor progress" (Doc. 39-12, p. 16).

Jones continued to have attendance issues even after her managers pointed out her

---

[2] It appears that Jones only received a formal counseling for this second no-call/no-show. But this would have been Jones's second no-call/no-show in a period of twelve months, thus this should have been a written warning.

tardies in the dependability section of her fourth annual review. For instance, in June 2016, Jones received a written warning for being tardy eight times in the prior twelve months (Doc. 36-16).

Despite her attendance issues, Dugger and Schultz promoted Jones in July 2016 (Doc. 36-13). While this promotion may have changed Jones's duties, her attendance issues continued. In early October 2016, Jones received a second written warning for being tardy ten times in the prior twelve months (Doc. 36-17).

Jones was two tardies away from termination when Dugger and Schultz promoted her to be a fulltime key carrier in late October 2016 (Doc. 36-14). As a key carrier, Jones developed managerial experience by holding the keys to open and close the store, knowing alarm codes, acting as the manager on duty when necessary, ensuring employees arrived for shifts on-time, and product movement (Doc. 40, pp. 26-27). In May 2017, at her fifth annual performance review, Jones received her highest overall annual performance rating (Doc. 39-12, p. 19). Jones's managers again highlighted the importance of dependability by noting Jones "is dependable and has had very few attendance issues" (Doc. 39-12, p. 20).

At her fifth annual performance review, Jones learned she would be attending the Coordinator Development Program ("CDP") (Doc. 39-2). The CDP is a training for coordinators to gain knowledge of T.J. Maxx's business (Doc. 39-1, p. 13, Doc. 40, p. 31). After completing the CDP, coordinators meet with their store managers to go over what

they learned (Doc. 39-1, p. 13). Thereafter,[3] key carriers are promoted to assistant managers (Doc. 39-1, p. 15; Doc. 40, p. 49).

Jones completed the CDP training in August 2017 (Doc. 39-2). But she continued to have attendance issues. In August 2017, Jones was formally counseled for being tardy on six occasions in the prior twelve months—including one tardy in July 2017 and August 2017 (Doc. 36-19). In January 2018, Jones was formally counseled again for tardies (Doc. 36-20). Then, in April 2018, Jones was formally counseled for a no call/no show (Doc. 36-21). At her sixth annual performance review, Jones's managers again noted that Jones had dependability issues and that she had been formally counseled for tardies (Doc. 39-12, p. 25).

### Jones Complains to Human Resources About Michele Bartels

Besides Dugger, Jones also reported to Michele Bartels ("Bartels") and Logan Keene ("Keene"). Bartels was the assistant merchandise manager during Jones's tenure at T.J. Maxx (Doc. 40, p. 35; Doc. 39-1, p. 7). Keene was the operations manager from February 2017 until Jones's resignation (Doc. 40, p. 27; Doc. 39-2; p. 5).

On November 22, 2017, Jones complained to T.J. Maxx's human resources department about Bartels mistreating her (Doc. 39-8). Jones did not mention race when she made her complaint to human resources (Doc. 40, pp. 37, 50). Jones explained that after she was promoted to the key carrier position, in October 2016, Bartels started talking

---

[3] Jones testified it takes at least *a couple of months* of being a key carrier until one is qualified to be an assistant manager (Doc. 40, p. 49). Jones later admitted that "sometimes it could take up to, you know, *two years, three years* before you get promoted" (*Id*.) (emphasis added). Dugger testified that "it's generally within a year, but there also has to be a position available for that associate" (Doc. 39-1, p. 15).

down to her, questioned her job performance, changed her schedule without letting her know, texted Jones while she was off work, made her work off the clock, and created a hostile work environment (Doc. 39-8, p. 2; Doc. 40, pp. 35-38). Around December 12, 2017, Dugger arranged a meeting between herself, Jones, Bartels, and Schultz (Doc. 39-13, p. 2; Doc. 40, pp. 37-38). At the meeting, Bartels denied mistreating Jones, but apologized for saying that she did not know Jones had a brother (*Id*. at pp. 38-39).[4]

After Jones complained about Bartels's mistreatment, Dugger and Bartels ignored Jones's questions and did not communicate with her (*Id*. at p. 43). Jones testified that Dugger's body language and her interactions created a hostile work environment (*Id*. at p. 44). Jones continued, explaining that after the November 2017 report to human resources, Dugger "was more nitpicking, and trying to find any little thing that [Jones] was doing wrong" (*Id*.). Jones characterized this nitpicking as "[m]icromanag[ing]" (*Id*.). At Jones's sixth performance review, Keene gave Jones her lowest score in six years (Doc. 39-12, p. 24). Jones believed she was passed over for assistant manager promotions because of her report to T.J. Maxx's human resources (Doc. 40, p. 46). Jones resigned on June 24, 2018 (Doc. 36-23; Doc. 40, p. 51).

On March 12, 2019, Jones filed a Charge of Discrimination with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC) alleging T.J. Maxx discriminated against her on the basis of race and

---

[4] Tragically, Jones's brother died in a car accident. Filled with grief, Jones asked for time off from T.J. Maxx (Doc. 40, p. 36). When Jones asked Bartels for time off work—Bartels said, "I didn't even know you had a brother" (*Id*.).

retaliated against her (Doc. 39-3). Jones received a Notice of Right to Sue from the EEOC on October 4, 2019 (*Id*. at p. 2).

On January 2, 2020, Jones timely filed this action within 90 days of receipt of the Notice of Right to Sue (*Id*.; Doc. 1). On January 25, 2021, Jones amended her complaint (Doc. 27).[5] Jones is proceeding on the following claims:

**Count I:**     Race Discrimination in violation of Title VII;

**Count II:**    Race Discrimination in violation of the Illinois Human Rights Act ("IHRA");

**Count III:**   Retaliation in violation of Title VII; and

**Count IV:**    Retaliation in violation of the IHRA.[6]

## DISCUSSION

### I.     Amber Fowler Affidavit

Jones relies heavily on the affidavit of Amber Fowler in response to T.J. Maxx's Motion for Summary Judgment. T.J. Maxx contests the admissibility of Fowler's affidavit by pointing out that Fowler "was not disclosed in Plaintiff's Rule 26(a)(1) Disclosures, Plaintiff's Interrogatory responses, . . . or Plaintiff's deposition" (Doc. 41, p. 2). T.J. Maxx also argues that Fowler's affidavit does not meet the requirements for unsworn declarations pursuant to 28 U.S.C. § 1746 (*Id*. at pp. 2-3). Ultimately, the Court agrees.

---

[5] Jones's counsel did not seek leave to amend or follow Local Rule 15.1, which requires that "[p]roposed pleadings must be submitted in accordance with the CM/ECF User's Manual Section 2.10 titled 'Submitting a Proposed Document.'" SDIL-LR 15.1.

[6] This Court has subject matter jurisdiction over Jones's Title VII claims pursuant to 28 U.S.C. § 1331. The remaining state law claims are before this Court by way of supplemental jurisdiction under 28 U.S.C. § 1367.

An affidavit must be "sworn to before someone who is authorized to administer an oath." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). At summary judgment, "unsworn documents purporting to be affidavits may be rejected." *Id*. Fowler's affidavit does not indicate that it was sworn before a notary or an officer authorized to administer an oath. Instead, Fowler's affidavit reads, "I, Amber Fowler, being duly sworn and competent to testify on the matter state, deposes and says as follows . . ." (Doc. 39-11). There is no notary signature and seal. *See, e.g., Owens v. Hinsley*, 635 F.3d 950, 954 (7th Cir. 2011) (noting that "submission was not literally an 'affidavit' because he did not swear to the content in the presence of someone authorized to administer oaths").

Construing Fowler's affidavit as an unsworn declaration does not make Fowler's testimony admissible because she did not sign it under penalty of perjury. *E.E.O.C v. World's Finest Chocolate, Inc.*, 701 F.Supp. 637, 639 (N.D. Ill. 1988) ("[28 U.S.C. § 1746] requires verification in *substantially* prescribed form. The crucial aspect of the form provided in the statute is that the person write his or her signature under penalty of perjury"). Notably, Jones's affidavit contains that "under penalty of perjury that the foregoing is true and correct . . ." (Doc. 39-9, p. 3), but Fowler's affidavit does not contain this language (Doc. 39-11).

Even if Fowler's affidavit met the requirements under 28 U.S.C. § 1746 or had been sworn, it would still not be considered because Fowler's affidavit contradicts Jones's deposition testimony. Jones cannot "thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996).

Finally, Jones cannot rely on Fowler's testimony because Jones's attorney failed to disclose Fowler as a potential witness pursuant to Federal Rule of Civil Procedure 26. Jones listed "[e]mployees (current and/or former) of TJ Maxx" in her Rule 26(a)(1) disclosures (Doc. 36-24, p. 2). While Fowler is allegedly a former employee of T.J. Maxx, this does not excuse Jones's failure to identify Fowler by name. A party is required to disclose initially "*the name* and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . . identifying the subjects of the information." FED. R. CIV. P. 26(a)(1)(A) (emphasis added).

A party may use *admissible* testimony[7] even if it failed to disclose a potential witness pursuant to Federal Rule of Civil Procedure 26—but the failure to identify or disclose must be substantially justified or harmless. FED. R. CIV. P. 37(c)(1). Jones has the burden of showing her failure to disclose or identify Fowler was either justified or harmless, but Jones has failed to provide a single reason. And even if Jones provided reasons why her failure was justified or harmless, the Court would still have to weigh the following factors:

    (1) the prejudice or surprise to the party against whom the evidence is offered;

    (2) the ability of the party to cure the prejudice;

    (3) the likelihood of disruption to the trial; and

    (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

---

[7] Again, Fowler's testimony is inadmissible as it is neither a sworn affidavit nor an unsworn declaration.

*David v. Caterpillar,* Inc., 324 F.3d 851, 857 (7th Cir. 2003). Here, the first three factors weigh against allowing Fowler's affidavit. Under the first factor, T.J. Maxx is prejudiced because it had no opportunity to discover Fowler's testimony or depose her before the dispositive motion deadline. To cure the prejudice, the Court would have to reopen discovery. But reopening discovery would further prejudice T.J. Maxx as it has fully briefed its summary judgment motion. Reopening discovery would certainly disrupt the trial date as the final pretrial conference is scheduled for May 26, 2021, and the presumptive jury trial month is June 2021.

The timeline of events is also concerning, because T.J. Maxx filed its motion for summary on February 8, 2021, and Jones's response was initially due on March 15, 2021. Had Jones not been granted more time to file her response, Fowler's affidavit may not even be part of the record as it was not signed until March 27, 2021. For these reasons, Fowler's affidavit must be excluded for the purposes of this summary judgment motion.[8]

## II.    Motion for Summary Judgment

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and

---

[8] The Seventh Circuit has "urge[d] district courts to carefully consider Rule 37(c), including the alternate sanctions available, when imposing exclusionary sanctions that are outcome determinative." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 760 (7th Cir. 2004). Even if the Court considered the statements within Fowler's affidavit, those statements would not change the result.

offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." *Id.* (citation omitted).

## A. *State Law Claims (Counts II & IV)*

To start, Jones's discrimination and retaliation claims under the IHRA are barred from review because she fails to allege and provide evidence of exhausting her administrative remedies with the Illinois Human Rights Commission ("Commission") before bringing this suit. Indeed, the IHRA provides for a comprehensive procedure for redressing human rights violations, under which a complainant must exhaust his or her administrative remedies before bringing a civil suit. The procedure becomes more convoluted when a complainant files a charge with the Department and the EEOC.

In the case of dual filings, the Department "shall take no action until the EEOC makes a determination on the charge and after the complainant notifies the Department

of the EEOC's determination." 775 ILCS 5/7A-102. When the EEOC does not issue a determination, but issues the complainant a notice of a right to sue, "the complainant must submit a copy of the EEOC's determination within **30 days** after service of the determination by the EEOC on complainant." *Id.* (emphasis added). If the EEOC "does not issue a determination, but does issue the complainant a notice of a right to sue . . . *and if the Department is timely notified of the EEOC's determination by complainant*, the Department shall notify the parties, within 10 business days after receipt of the EEOC's determination, that the Department will adopt the EEOC's determination as a dismissal for lack of substantial evidence unless the complainant requests in writing within 35 days after receipt of the Department's notice that the Department review the EEOC's determination." *Id.* (emphasis added).

The complainant may then commence a civil suit in two instances:  (1) upon receiving a final report from the Department; or (2) if the Department fails to issue a report within 365 days. 775 ILCS 5/7A-102(D), (G)(2). If the Department fails to issue a report within 365 days, the complainant has ninety days to either proceed before the IHRC or commence a civil action. *Id.*

Failure to comply with the IHRA's exhaustion requirements warrants dismissal of an IHRA claim. Jones alleges that she "submitted a charge of discrimination with the Illinois Department of Human Rights and the St. Louis office of the Equal Employment Opportunity Commission ("EEOC") . . . [and] [t]he EEOC issued a Notice of Plaintiff's Right to Sue, dated October 4, 2019" (Doc. 27, p. 4). However, a Right to Sue letter from

the EEOC is not a substitute for a final report from the Department. *See Wierciszewski v. Granite City Ill. Hosp. Co.*, 2011 WL 1615191, at *3 (S.D. Ill. Apr. 28, 2011).

Further, Jones has failed to provide facts that she submitted a copy of the EEOC's determination to the Department within 30 days after service of the determination by the EEOC. 775 ILCS 5/7A-102(A-1)(1)(iv); *see* 775 ILCS 5/7A-102(A-1)(2) (providing that the Department will only take substantive action on the EEOC determination if it "is timely notified of the EEOC's findings by complainant"); *see also Jafri v. Signal Funding LLC*, 2019 WL 4824883, at *2 (N.D. Ill. Oct. 1, 2019) (holding that the plaintiff failed to administratively exhaust her IHRA claims because plaintiff failed to submit a copy of the EEOC's determination to the Department within 30 days after service of the determination by the EEOC on plaintiff).

Accordingly, the Court finds that it lacks jurisdiction over Jones state law claims, and Counts II and IV must be dismissed.

**B.  *Title VII Discrimination – Failure to Promote (Count I)***

Under Title VII, a charge of racially discriminatory employment practices must be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). "Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII." *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 860 (7th Cir. 2005) (citing *Martinez v. United Auto., Aerospace & Agric. Implement Workers of Am.*, 772 F.2d 348, 350 (7th Cir. 1985)). "For purposes of this statute of limitations, discrete discriminatory employment actions such as termination, *failure to promote*, denial of a transfer, or refusal to hire are deemed to have been taken on the date

they occurred, even if they form part of an ongoing practice or are connected with other acts." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–11 (2002)) (emphasis added). Each discrete discriminatory act "starts a new clock for filing charges alleging that act," and charges not filed within 300 days of the act in question are not actionable. *Id.* (quoting *Morgan*, 536 U.S. at 113).

T.J. Maxx argues that "[Jones] cannot complain of alleged promotion decisions predating May 16, 2018—300 days before she filed the Charge" (Doc. 35, p. 18). Thus, according to T.J. Maxx, "Plaintiff cannot establish a *prima facie* case for discrimination because she has failed to identify any open ASM position between May 16, 2018 and her resignation in June 2018 for which she was rejected" (Doc. 35, p. 18).

Jones responds that her claims are not time-barred under the continuing violation doctrine (Doc. 39, p. 10). In support of this argument, Jones argues "there is no question that the promotion denial (i.e., performance evaluation score of 35 in May 2018 disqualified Ms. Jones of a promotion) occurred within the limitations period" (*Id.*). "Further, two individuals were promoted from outside the store in—in September 2017 and March of 2018—and Plaintiff was passed up for these promotions" (*Id.*). Jones notes that "[t]he critical question is whether these acts are related closely enough to constitute a continuing violation" (*Id.*).

The Court agrees with T.J. Maxx. "It is well settled [ ] that an employer's failure to promote an employee is a discrete act, and thus is not subject to the continuing violation doctrine." *Carter v. Dart*, 262 F. Supp. 3d 713, 720 (N.D. Ill. 2017) (citing *Beamon*, 411 F.3d

at 860)). Accordingly, Jones's claim of discrimination based on T.J. Maxx's failure to promote must be dismissed.

Setting aside the untimeliness of Jones's failure to promote claims does not help Jones as they further fail on the merits. In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit addressed the murky jurisprudence surrounding the methods of proof in employment discrimination cases. The Court in *Ortiz* recognized, "[t]he use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years." *Id.* at 764. Thus, *Ortiz* instructs district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* at 765. "*Ortiz*, however, did not alter the burden-shifting framework created by *McDonnell Douglas*." *David v. Board of Trustees of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (internal citations, quotations, and alterations omitted).

Here, Jones argues she meets her burden under *McDonnell Douglas* (Doc. 39, p. 12). Under the burden-shifting model, Jones must first produce evidence of a *prima facie* case for failure to promote under Title VII that shows: (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) T.J. Maxx promoted someone outside the protected group who was not better qualified than she, or who "had similar or lesser qualifications." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). If Jones can make the *prima facie* case, the burden shifts to T.J. Maxx to produce a legitimate, non-discriminatory reason for not selecting

Jones for promotion. *Id*. at 891 Then the burden shifts back to Jones to produce evidence that T.J. Maxx's explanation was pretextual. *Id*. at 892.

1. *Qualified for the Position Sought*

It is undisputed that Jones, a black woman, belongs to a protected class, but to evaluate her claim, the Court must determine whether Jones was qualified for all alleged promotions. Jones argues that she was rejected for a minimum of five promotions after she received her college degree in May 2014 (Doc. 39, p. 12). Jones testified, however, that T.J. Maxx failed to promote her to assistant manager—and that she would not be qualified for the assistant manager promotion *until* she was a key carrier for a couple of months (Doc. 40, pp. 48-49). Construing the facts in a light most favorable to Jones, Jones became a key carrier in October 2016, and thus was qualified for the following promotions: (1) the Carbondale assistant manager promotion in February 2017; (2) the Cape Girardeau assistant manager promotion in September 2017; and (3) the Paducah assistant manager promotion in March 2018.[9]

2. *Qualifications of Those Promoted*

Jones fails to provide sufficient evidence that T.J. Maxx promoted someone outside the protected group who was not better qualified than she for these positions. For instance, Logan Keene—the employee promoted to Carbondale assistant manager in

---

[9] Indeed, when asked whether Jones was alleging that she should have been offered the Cape Girardeau assistant manager promotion in 2014 over Megan Adams—Jones replied—"[n]ot at that time" (Doc. 40, p. 56). When asked whether Jones was alleging that she should have been offered the assistant manager promotion over Kristie Kelly—Jones replied—"[n]ot at that time" (*Id*.). Also, Jones confirmed that she was not alleging she should have been offered the Carbondale assistant manager promotion in 2010 over Michelle Bartels (Doc. 39, p. 13).

February 2017—had attended the CDP training a year prior to Jones, and Keene's overall performance was rated "4—Exceeds Expectations" prior to his promotion in February 2017 (Doc. 39-2, p. 5). Jones also has failed to provide evidence that Keene had attendance or other dependability issues. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) (noting that "[e]mployees must be similar 'in all material respects,' including engaging in identical or comparable misconduct, in order to reveal whether differential treatment is occurring").

As for "Emily"—the employee hired as the Cape Girardeau assistant manager in *September 2017*—Jones uses an affidavit[10] to provide evidence that "Emily" was no better qualified than she was (Doc. 39-9). In her earlier deposition, however, Jones testified that she did not remember a name, but for the *March 2018 opening* the person promoted worked at Charlotte Russe (Doc. 40, p. 47). The Seventh Circuit "generally look[s] with disfavor on using of affidavits that contradict earlier deposition testimony" *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1001 (7th Cir. 2000). Allowing Jones to use the more favorable affidavit version of her testimony does not help her because "a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (internal citation and quotation omitted). Jones has not provided this information—or any other

---

[10] This is not an affidavit. Again, an affidavit must be "sworn to before someone who is authorized to administer an oath." *Pfeil*, 757 F.2d at 859. Rather, this is an unsworn declaration because Jones writes her signature under penalty of perjury (Doc. 39-9, p. 3).

information—about Emily's years of managerial experience, her duties, or her position at Charlotte Russe.

Again, Jones relies on her affidavit to provide evidence that the unknown woman—hired as the Paducah assistant manager in March 2018—was no better qualified than she was (Doc. 39-9). Similar to "Emily," Jones has failed to provide evidence of this unknown woman's qualifications—besides the fact that she was an outside hire with management experience at Big Lots. There is no evidence of the unknown woman's years of managerial experience, her duties, or her position at Big Lots. Jones simply has not provided sufficient evidence that this unknown woman was not better qualified than Jones for this position.[11]

3. *Pretext*

Even assuming that Jones could make out a *prima facie* case of race discrimination based on T.J. Maxx's failures to promote, T.J. Maxx produces evidence of legitimate, nondiscriminatory reasons for promoting others over Jones. According to T.J. Maxx, Jones was not promoted to the assistant manager position for the Carbondale store in February 2017 because she was not qualified for promotion at that time (Doc. 35, p. 20). T.J. Maxx points to Jones needing to improve upon her dependability (*Id*.). T.J. Maxx also points out that Jones had not attended the CDP training (*Id*.). T.J. Maxx continues explaining that Jones was not promoted to the assistant manager positions for the Cape Girardeau store in September 2017 and the Paducah store in March 2018 because "she

---

[11] Jones's Response in Opposition to Defendant's Motion for Summary Judgment argues that "[t]he only 2017 CDP Participants to promote to store manager were white" (Doc. 39, p. 6). But Jones has failed to provide evidence—much less argue—that these white 2017 CDP Participants were similarly situated.

was not the most qualified candidate given her ongoing dependability issues" (*Id.* at p. 21).

T.J. Maxx's reason—dependability—is supported by evidence. Leading up to the February 2017 promotion, Jones was tardy in September 2016 and October 2016 (Docs. 36-17; 36-19). Leading up to the September 2017 promotion, Jones was tardy at least four times—March 2017, May 2017, July 2017, and August 2017 (Doc. 36-20). Leading up to the March 2018 promotion, Jones was tardy twice in December 2017 (*Id.*).

After producing evidence of a legitimate, nondiscriminatory reason for hiring others, the burden shifts back to Jones to produce evidence that T.J. Maxx's proffered reason was pretextual. *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020). Jones argues that T.J. Maxx's proffered explanation was pretextual because "Dugger admitted tardiness had no bearing on promotions, nor was this ever given as a reason for her not to be promoted" (Doc. 39, p. 16). But Jones is incorrect, and her counsel's characterization of Dugger's testimony is troubling. Dugger testified that tardies do not necessarily prevent an associate from receiving *wage promotions* (Doc. 39-1, p. 13). Wage promotions are not assistant manager promotions. Dugger also testified that a *no-call/no-show* does not make an associate ineligible for an assistant manager promotion if he or she was on that track (*Id.* at p. 24). This testimony is certainly not evidence that "Dugger admitted *tardiness* had no bearing on promotions" (Doc. 39, p. 16) (emphasis added). As for the assertion that T.J. Maxx never told Jones that tardiness impacted promotions, Jones has failed to provide any evidence of this assertion. Rather, the

evidence provided establishes that in a majority of Jones's performance reviews, Jones's managers referred to Jones's tardies and dependability (Doc. 39-12, pp. 3, 7, 15, 16, 25).

Jones also argues that failing to promote her was discriminatory because Dugger and Schultz have a history of failing to promote African Americans and because an African American has never been a manager at the Carbondale store (Doc. 39, p. 16). "An employer's policy and practice with respect to employing members of protected classes 'can be relevant evidence of pretext or discrimination,' but that evidence 'must undercut the specific justifications given by the employer.'" *Barnes*, 946 F.3d at 390 (quoting *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 858 (7th Cir. 2019)) (finding that allegations of "an 'ongoing history of discrimination'" is "not enough to impugn a particular employment decision"). Jones has not pursued a disparate-impact theory, which would require "isolating and identifying the specific employment[ ] practices that are allegedly responsible for any observed statistical disparities." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). Nor has she shown that intentional racial discrimination was a "pattern or practice" at T.J. Maxx. *Id.*

Accordingly, Jones's race discrimination claim based on the failure to promote fails as a matter of law because Jones did not timely file her EEOC Charge related to the promotions. Setting the untimeliness aside, Jones has not presented similarly situated comparators, and she failed to provide evidence that T.J. Maxx's reasons for not

promoting her were pretextual. For these reasons, T.J. Maxx is entitled to summary judgment on Jones's failure to promote claim.[12]

## C. *Title VII – Constructive Discharge*

T.J. Maxx notes that "it is unclear whether Plaintiff is alleging constructive discharge in the Amended Complaint" (Doc. 35, p. 23). The Court agrees, but will evaluate the claim, nonetheless. The Seventh Circuit recognizes two forms of constructive discharge. In the first form, an employee resigns due to discriminatory "working conditions even more egregious than that required for a hostile work environment claim." *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019) (quoting *Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015)). Examples of this type of constructive discharge include threats to a plaintiff's life or physical safety. *See, e.g., Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment included repeated use of noose and implied threats of physical violence).

"The second occurs when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Fields*, 928 F.3d at 625 (citing *Wright*, 798 F.3d at 527; *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010)). Here, a plaintiff must still show her working conditions were "so intolerable that her resignation qualified as a fitting response." *Pennsylvania State*

---

[12] Even if Jones's discrimination claim under the IHRA was properly before the Court, it would fail for the same reasons set forth above because "[t]he standards for Illinois state-law discrimination claims mirror those for Title VII claims." *Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 754 (7th Cir. 2014) (citations omitted).

*Police v. Suders*, 542 U.S. 129, 134 (2004). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.* at 141. "[A] working condition does not become intolerable or unbearable merely because 'a prospect of discharge lurks in the background.'" *Chapin*, 621 F.3d at 679 (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)).

Construing the evidence in Jones's favor, there is nothing to suggest that her working conditions had become so intolerable that a reasonable person in her position would have felt compelled to resign. The hostile work environment[13] allegedly began in October 2016, when Jones was promoted to key carrier, and ended when Jones resigned in June 2018 (Doc. 39, p. 8; Doc. 39-8, pp. 2-3; Doc. 40, pp. 38-40, 43). When Jones asked Dugger or Bartels a question, they ignored her and there was no communication (*Id.*). Jones testified that Dugger's body language and her interactions created a hostile work environment (*Id.* at p. 44). Jones continued explaining that after the November 2017 report to human resources, Dugger "was more nitpicking, and trying to find any little thing that [Jones] was doing wrong" (*Id.*). Jones characterized this nitpicking as "[m]icromanag[ing]" (*Id.*).

The Court finds that there is nothing so unbearable about these working conditions that a reasonable employee would have felt compelled to resign. The Seventh Circuit has explained that a court is not to function as a "super-personnel department intervening whenever an employee feels he is being treated unjustly." *Cardoso v. Robert*

---

[13] Notably, Jones does not bring a hostile work environment claim.

*Bosch Corp.*, 427 F.3d 429,435 (7th Cir. 2005). While Jones may have felt nitpicked by Dugger and Bartels, "anti-discrimination laws are not triggered by rude behavior." *Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 978 (N.D. Ill. 2014) (citing *Ford v. Minteq Shapes & Servs.*, 587 F.3d 845, 848 (7th Cir. 2009)). Furthermore, not every perceived unfairness in the workplace can be attributed to discriminatory motivation just because the employee belongs to a protected class. *Id.* The employee must be able to sufficiently connect the discrimination to her race. *Id.* Jones has not done that here.

Because Jones has not set forth any evidence demonstrating that she was constructively discharged from her employment with T.J. Maxx, T.J. Maxx is entitled to judgment as a matter of law.

**D.  *Title VII Retaliation Claim (Count III)***

In Title VII retaliation cases, a plaintiff has the burden of producing enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the employer took a materially adverse action against her; and (3) there was a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)). Here, Jones fails to produce evidence that she engaged in a protected activity and that T.J. Maxx took a material adverse action against her.

1.  *Protected Activity*

Despite Jones's counsel changing what protected activity Jones engaged in at every step of the litigation—there is no evidence that Jones engaged in a protected

activity.[14] In her First Amended Complaint, Jones alleges that in 2017, a woman from human resources for T.J. Maxx came from Chicago, and Jones reported her issues with being passed over for a promotion (Doc. 27, p. 6). In her deposition, however, Jones testified that she did not complain to human resources about being passed over for a promotion (Doc. 40, pp. 49-50).

After Jones testified that the alleged protective activity never occurred, Jones's counsel changed course—asserting that the protected activity occurred on November 22, 2017, when Jones complained to human resources (Doc. 39, p. 15). But Jones did not mention race when she made her complaint to human resources (Doc. 40, p. 50). In fact, during her employment with T.J. Maxx, Jones did not talk to any coworkers about race discrimination—aside from <u>one</u> conversation where Keene only asked whether Jones thought that she was not promoted to assistant manager because she was black (*Id*. at pp. 41, 50). In response, Jones said she never thought about her race as the reason for not being promoted (*Id*. at p. 41). *See Miller*, 203 F.3d at 1008 (finding that "[a]n employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints"). Because there is no evidence that Jones engaged in a protected activity—her retaliation claims fail.

2. *Materially Adverse Action*

---

[14] Jones alleges that "Plaintiff engaged in protected activity when she took the following actions, *including but not limited to*, reporting her issues with being passed over for a promotion" (Doc. 27). Even though Jones never alleged in her complaint that the November 2017 report to human resources was a protected activity, for the sake of completeness, the Court will assume that the phrase "including but not limited to" somehow gives Jones the ability to change the protected activity this late in the litigation.

Even if Jones engaged in a protective activity, there is no evidence that T.J. Maxx took a materially adverse employment action against her after the November 2017 report.[15] Jones was not fired, discharged, denied a promotion, or reassigned to a different position with different responsibilities, nor were her compensation, benefits, or terms of employment changed. Instead, Jones alleges that after engaging in a protected activity, T.J. Maxx's agents took "several adverse employment actions against Plaintiff because of that activity . . . subjecting Plaintiff to retaliation for voicing her opinion regarding her lack of promotion, including but not limited to:  (a) ostracizing Plaintiff; (b) refusing to promote Plaintiff; (c) criticizing Plaintiff's work performance; and (d) disciplining her" (Doc. 27, p. 8). The Court will address each in turn.

   *i.    Ostracizing Jones*

   Retaliatory ostracism by supervisors may amount to a materially adverse action if it is sufficiently severe. *See Parkins v. Civil Constructors,* 163 F.3d 1027, 1039 (7th Cir. 1998) (acknowledging that "[p]reviously, we suggested that an adverse employment action might occur when an employer orders its employees to shun the plaintiff, provided that this activity causes material harm to the plaintiff"). "Binding case law makes clear, however, that the silent treatment and ostracism do not constitute materially adverse

---

[15] The Court cannot evaluate whether Jones was retaliated after the alleged complaint to human resources for being passed over for a promotion because Jones's testimony confirms there was no complaint to human resources for being passed over for a promotion (Doc. 40, pp. 49-50). Further, Jones testified that it was in 2015 when she had a *conversation* with human resources about her career goals (*Id.* at pp. 27-28). During this *conversation,* Jones did not complain about being passed over for a promotion, but this "was just a *casual conversation*" (*Id.* at p. 28) (emphasis added). Jones explained the person from human resources "was asking [Jones] who [she] was and [her] position and different things" (*Id.*). Jones also testified that "[she] just said that basically, you know, [she] plan[s] on moving up in the company [ ] [a]nd that's how that was brought up" (*Id.*). In fact, Jones's counsel no longer advances this as a protected activity at summary judgment.

employment actions." *Hamilton v. RDI/Caesars Riverboat Casino LLC*, 179 F. Supp. 2d 929, 940 (S.D. Ind. 2002) (citing *Parkins*, 163 F.3d at 1039).

In *Bell v. E.P.A.*, 232 F.3d 546 (7th Cir. 2000), an employee[16] worked as an environmental engineer for the EPA and sought a promotion—along with sixteen eligible candidates. To evaluate the candidates, the EPA required submissions of a written application, a copy of the most recent annual performance review, and a qualification statement. *Id*. at 549. The employee received a perfect score from EPA's rating plan "that described the knowledge, skills, and abilities an applicant needed to have and listed five factors to be considered." *Id*. To make the final decisions for promotion, EPA section chiefs formed a panel to interview the candidates. *Id*. Unfortunately, the employee was not selected by the panel for promotion. *Id*. The employee then sent a memorandum to the panel raising questions about the selection process and complained to the EPA alleging discrimination. The employee then claimed that a supervisor failed to greet, speak, and cancelled a conference that the employee scheduled in retaliation for the employee's complaint.

On these facts, the district court granted summary judgment in favor of the EPA. *Bell v. U.S. E.P.A.*, 1999 WL 965710, at *16 (N.D. Ill. Oct. 15, 1999), aff'd in part, rev'd in part sub nom. The court noted that the employee failed to establish a *prima facie* case of retaliation and held that the employee's retaliation claims were "isolated incidents of trivial matters, and do not constitute a material change in the terms and conditions of

---

[16] There were four plaintiffs in *Bell*, but for the sake of brevity and clarity, the Court refers to only one employee, Prasinos.

[her] employment." *Id*. On appeal, the Seventh Circuit affirmed summary judgment on the employee's retaliation claim. The Seventh Circuit held that "[t]hese are trivial matters that do not rise to the level of actionable retaliation." *Bell*, 232 F.3d at 555.

The Court acknowledges that unlike the ostracism in *Bell*, Jones's alleged ostracism caused her to miss out on two assistant manager positions (Doc. 40, p. 49). The problem is the assistant manager position in Cape Girardeau, Missouri, was filled in September 2017—**before** Jones made the November 2017 report to human resources (Doc. 39-9, p. 2). For the other assistant manager position in Paducah, Kentucky, it was not until *March or April 2018* that Jones's store was in the same region as the Paducah store Doc. 39-1, p. 18; Doc. 40, p. 42). This is significant because Jones asserts that "[i]n *March of 2018*, a white female was hired as a new assistant manager to be an assistant manager in the Paducah, KY store" (Doc. 39-9, p. 2) (emphasis added). But construing the facts in a light most favorable to Jones, there still is no evidence that Dugger or other managers knew about the open position in Paducah until <u>after</u> it was filled.[17] Indeed, Jones testified that Keene—the manager who told her about the Paducah position—was not able to tell her about any additional openings because he was not very familiar with that region yet (Doc. 40, p. 42). Accordingly, the alleged ostracism towards Jones does not constitute a materially adverse action in and of itself.

ii.  *Refusing to Promote Jones*

In her First Amended Complaint, Jones alleged that T.J. Maxx refused to promote

---

[17] Also, there is no evidence that T.J. Maxx had an established system for managers to know about openings in stores in other regions.

her in retaliation for engaging in a protected activity. Jones's testimony contradicted this allegation, however, when she conceded it takes at least *a couple of months* of being a key carrier until one is qualified to be an assistant manager (Doc. 40, p. 49). Jones further admitted that "sometimes it could take up to, you know, *two years, three years* before you get promoted" (*Id*.) (emphasis added). Because Jones had been a key carrier *less than two years* when she resigned in June 2018, Jones's testimony contradicts her allegation that T.J. Maxx refused to promote her in retaliation for the November 2017 report.

At summary judgment, Jones's counsel changed course—arguing that the negative performance review in May 2018 was in retaliation for her November 2017 report—and this performance review kept her from getting a promotion (Doc. 39, p. 9). The Seventh Circuit has recognized in *certain contexts* "a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation (as distinct from a claim of discrimination based on a prohibited classification)." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 741 (7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016); *but see Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1108–09 (7th Cir. 2012) (noting that "[a]t the outset, it is not clear whether a negative performance review, standing alone, can ever constitute a materially adverse employment action in the retaliation context"). To even be considered an adverse action, the negative performance review must be tied to a tangible employment consequence. *See Gupta v. City of Chicago*, 2017 WL 2653144, at *4 (N.D. Ill. June 20, 2017) (noting that the employee's negative performance reviews in *Silverman* "were accompanied by a tangible employment consequence:  her contract was

not renewed at the end of the school year").

Jones's negative performance review in May 2018 does not amount to an adverse action because it is not tied to tangible consequences. Jones received a *raise* at this review (Doc. 39-12, p. 27). When asked whether this is an overall positive review, Jones replied, "[f]or the most part" (Doc. 40, p. 48). Jones also testified that in May 2018 no one had told her that they were thinking about terminating her employment, no one had threatened to fire her, and at this timeframe Jones did not believe that her managers were considering terminating her employment (*Id.*).

Jones conclusively argues that "[t]his performance review kept Ms. Jones from getting a promotion[,]" (Doc. 39, p. 9), and cites to the EEOC Charge from March 12, 2019 (Doc. 39-3). This is not evidence that the performance review kept her from a promotion. Accordingly, the alleged refusals to promote Jones do not constitute materially adverse actions.

iii.     *Criticizing Work Performance*

The incidents between Jones, Dugger, and Bartels also do not amount to an adverse employment action. Jones testified she was nitpicked by Dugger and Bartels after making the November 2017 report (Doc. 40, p. 43). According to Jones, Dugger and Bartels's nitpicking caused her to be unable to get into a routine (*Id.* at p. 44). Such petty slights are insufficient to constitute retaliation—especially if they are no more "than a mere inconvenience or an alteration of job responsibilities." *Atanus v. Perry*, 520 F.3d 662, 678 (7th Cir. 2008) (internal quotation and citations omitted).

iv.   *Disciplining Jones*

At summary judgment, Jones's counsel appears to abandon the notion that T.J. Maxx disciplined Jones in retaliation. Counsel has failed to explain whether Jones's supervisors falsified disciplinary actions or whether Jones was disciplined more often after making the report. Still, the Court reviews each disciplinary action and the frequency of counseling sessions or written warnings to determine if an adverse action is present.

A cursory review supports the notion that T.J. Maxx disciplined Jones more often in retaliation for the November 2017 report. For instance, T.J. Maxx disciplined Jones *three times* between June 2017 and May 2018—her sixth review period—but disciplined Jones only *two times* between June 2016 and May 2017—her fifth review period (Docs. 36-16, 36-17, 36-19, 36-20, 36-21). But a deeper review of the record between June 2017 and May 2018 shows that two of the three disciplinary actions were a result of tardiness that took place *before* the November 2017 report. The August 2017 formal counseling speaks for itself, and the January 2018 formal counseling was partially a result of four tardies that took place in March 2017, May 2017, July 2017, and August 2017 (Docs. 36-19, 36-20).

Ultimately, the only disciplinary action that arose wholly after the November 2017 report was the April 2018 formal counseling for a no call/no show (Doc. 36-21). Jones did not dispute this disciplinary action (Doc. 40, p. 41). Also, Jones testified that she did not believe that she was going to be terminated as a result of the formal counseling (*Id*.). *Compare Brooks v. City of Kankakee, Illinois*, 2019 WL 2572520, at *16 (C.D. Ill. Apr. 12, 2019) (holding that reprimand was materially adverse when the reprimand was in retaliation

for plaintiff engaging in protected activities, and the reprimand concluded with "any future violation of this policy will be grounds for your discipline up to and including termination of your employment . . ."). Accordingly, the April 2018 disciplinary action was not "materially adverse," and Jones has not established that she was disciplined in retaliation for her November 2017 report.[18]

    3.  *Causal Connection*

Assuming only for the sake of argument that Jones engaged in a protected activity and the final negative performance review was a material adverse action,[19] Jones still fails to present evidence of a causal connection between the two. To establish a causal link, a plaintiff must demonstrate that the defendant "would not have taken the adverse . . . action but for [her] protected activity." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (citations omitted).

Jones argues that in her "next performance review, Dugger rated Ms. Jones . . . her lowest score in six years" (Doc. 39, p. 15). The problem is Keene was the manager who gave Jones this review—not Dugger (Doc. 39-12, p. 24).[20] Jones has not provided evidence that Keene knew about the November 2017 report (Doc. 39-8, p. 2). As such, Jones fails to present evidence of a causal connection between an alleged protected activity and an

---

[18] Another way Jones could meet the element of an adverse employment action as required for retaliation claims is to demonstrate that she was constructively discharged. As noted above, however, Jones has failed to demonstrate that she was constructively discharged.

[19] In her response to T.J. Maxx's Motion for Summary Judgment, Jones only touches on the negative performance review. As such, the Court will not evaluate whether Jones provided evidence of a causal connection between any other alleged or *unalleged* adverse actions.

[20] At best, Jones can combat this evidence by pointing out that Dugger testified that all the managers "give input on evaluations because we all work with all the associates" (Doc. 39-1, p. 9). But Dugger later testified that Keene was responsible for evaluating Jones (Doc. 39-1, p. 10). Jones also testified that Keene was the main appraiser (Doc. 40, p. 47).

adverse action.

    4.  *Similarly Situated Comparators*

Analyzing whether Jones has identified any similarly situated employees does not help her. *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018) (finding that it was appropriate for the district court to analyze causal connection and proceed to whether the plaintiff "had identified a similarly situated employee or rebutted the [defendant's] non-discriminatory explanations as pretextual [ ] [because] [b]oth elements (similarly situated employees and pretext) are necessary for a factfinder to infer a retaliatory motive under the *McDonnell Douglas* framework").

Jones does not introduce new similarly situated employees in her retaliation argument. Instead, Jones notes "the similarly situated white employees discussed above did not engage in protected activity" (Doc. 39, p. 15). Notably, in failure to promote claims, a plaintiff must show that the employer promoted someone outside the protected group who was not better qualified than she or who "had similar or lesser qualifications." *Riley*, 829 F.3d at 891-92. In retaliation claims, however, a plaintiff must show that he or she "was treated less favorably than similarly situated employees who did not engage in protected activity." *Wilkie*, 909 F.3d at 866. Splitting hairs is unnecessary, because under either analysis the "similarly situated white employees discussed above" did not deal with the same supervisors, were subject to the same standards, and engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018). Keene is the most similar to Jones, but the Court has already

explained the reasons why the two are too dissimilar for the comparison to defeat summary judgment.

5. *Pretext*

Finally, assuming for the sake of argument that Jones had established a *prima facie* case of retaliation, T.J. Maxx provides the same reasons for its actions as it did for Jones's failure to promote claim. (Doc. 35, p. 24). Although Jones alleged actions besides the failure to promote as retaliation, she only argued pretext once (Doc. 39, p. 16). Having already found that Jones failed to provide evidence of pretext—Jones fails here as well.[21]

## CONCLUSION

For these reasons, the Motion for Summary Judgment filed by Defendant T.J. Maxx (Doc. 35) is **GRANTED**. This action is **DISMISSED with prejudice,** and the Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  May 17, 2021**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

---

[21] Even if Jones's retaliation claim under the IHRA was properly before the Court, it would fail for the same reasons set forth above because the standards for Illinois state-law retaliation claims mirror those for Title VII claims.  *Mahran v. Advoc. Health & Hosps. Corp.*, 2019 WL 952131, at *15 (N.D. Ill. Feb. 26, 2019) (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (1989)).